In the Matter of the ESTATE of Robert M. AKERS, Deceased.

Nos. 47237, 47228 and 47371.

Court of Appeals of Oklahoma, Division No. 2.

April 29, 1975.

O. A. Cargill, Jr., Leslie L. Conner, James M. Little, Leslie L. Conner, Jr., Conner, Little & Conner, Oklahoma City, for appellant Barbara Akers.

John B. Ogden, Oklahoma City, for appellant Patty Akers.

Shadid, Black & Albert, Oklahoma City, for appellee Verna Lee Akers.

Howell & Stinchecum, Oklahoma City, for appellees Harry Akers, Joseph M. Akers, Beatrice Toti and Lucille Morris.

BRIGHTMIRE, Judge.

Three women vie for the legal status of widowhood each claiming to be the common-law wife of the late Robert M. Akers —a prominent 62-year-old Oklahoma City land developer and businessman who died intestate October 18, 1973, leaving a substantial estate. Two of the "wives"—Barbara and Verna—filed separate petitions for letters of administration four days later on October 22, while the third one— Patty—filed her petition December 5. In the meantime on October 29 the brothers and sisters (Harry Akers, et al) of decedent filed a fourth petition seeking the letters as next of kin and only legal heirs.

In the middle of a hearing on the consolidated petitions held January 21, 1974, the trial court sustained an oral motion of Harry Akers, et al and dismissed the petitions of Barbara and Patty.[1] These two would be "widows" filed separate appeals which are consolidated here for review along with a second appeal by Barbara from a later order of the trial court appointing the special administrator of the estate, one Herman Merson, general administrator and continuing his $250,000 surety bond.[2]

The dismissals came about when the court concluded the petitions of Barbara Tate Akers and Patty Sheppard Akers amounted to a collateral attack on a divorce decree obtained by Verna, the third petitioner, from Robert Akers on August 7, 1973—a couple months before the latter's death. While the marriage claims of Barbara and Patty are of course opposed to each other, they both share a common conviction here and that is that their petitions were not affected by the collateral attack doctrine and therefore were erroneously dismissed. We agree and reverse.

Historically Robert Akers' first recorded romance dates back to 1936 when he ceremoniously wedded Alma. A childless marriage, it lasted 35 years—until July 12, 1971, when a divorce was granted the parties.

In the meantime, however, Robert Akers developed other amors. Barbara, for instance, says she started living with him as his common-law wife in 1947 and continued to do so until his death. Patty on the other hand describes how she at the age of 28 began to share a common-law marital bed with the same man in 1965—a "marriage" that also lasted until he died. Both claim their initial illicit relationships "ripened" into a legal common-law marriage on January 13, 1972—the day on which ended the six non-remarriageable months following the Alma divorce.

And, as if the complexity of the concupiscent Robert's life-style was insufficient, he wooed and won still another paramour, Verna, whom he whisked off to Texas for

---

1. Harry Akers and Verna, of course, joined forces in the bid to oust Barbara and Patty from the lawsuit. At the time these appeals were perfected no further disposition had been made of either Harry Aker's petition or Verna's.

2. The three appeals are consolidated under No. 47,237, the first one filed by Barbara. Patty's appeal bears number 47,228 and Barbara's second one No. 47,371.

a ceremonial wedding. Five months later, however, Verna filed for a divorce alleging the parties "were legally married on February 22, 1973, at Gainsville, Texas . . . but have lived together only a short period" because they soon discovered they were completely and irreconcilably incompatible. Robert Akers filed an entry of appearance in which he waived the right to plead and agreed the cause could be heard and decided without notice to him. Consequently on August 7, 1973, a divorce decree was rendered finding the parties "had been married, as in the Petition set forth."

It is this finding that both Harry Akers and Verna contend Barbara and Patty are collaterally attacking by trying to prove one of them is the lawful surviving wife of Robert.[3] More explicitly put, the theory of Harry and Verna is that if either Barbara or Patty did effect a common-law marriage with Robert it had to be on January 13, 1972, and was therefore somehow destroyed by Verna's subsequent marriage and divorce which featured a judicial pronouncement establishing that Verna "legally married" Robert—a finding that is binding on Barbara and Patty and one they must successfully reverse by a direct attack before they can gain standing to have their allegations of marriage heard in the probate court.

To resolve the matter requires an inquiry into the definition, scope, and nature of this state's collateral attack doctrine.

■ Definitionally a collateral attack on a domestic judgment is generally considered to be "an attempt to avoid, defeat, or evade it, or deny its force and effect, in some incidental proceeding not provided by law for the express purpose of attacking it." *May v. Casker*, 188 Okl. 448, 110 P.2d 287 (1940); *Hixson v. Cook*, Okl., 379 P. 2d 677 (1962). At least one case defines "collateral attack" as an "objection" incidentally made to a former proceeding during a later one—a definition suggesting the necessity of expressly objecting to an earlier judgment in order to run afoul of the doctrine. *Richardson v. Carr*, 68 Okl. 46, 171 P. 476 (1917).

■ One of the general rule's features is its invocation of a presumption that judgments, when impeached collaterally, are in all respects valid. *Warren v. Stansbury*, 190 Okl. 554, 126 P.2d 251 (1942). Of more importance, however, is the fact that the doctrine is closely akin to two others —res judicata and collateral estoppel by judgment [4]—and appears to have emerged from the equitable law of estoppel which the courts early created to aid justice and its administration by according finality to adjudicated controversies and thereby heading off repetitive litigation. *Woodrow v. Ewing, Okl.*, 263 P.2d 167 (1953).

■ So in order that the doctrine be not used as an instrument of gross injustice the high court of this state like those of other jurisdictions has from time to time recognized certain restrictions on or exceptions to or variations of the collateral attack doctrine as factual peculiarities came before them. For instance, Oklahoma has held that where a judgment is void it may be attacked collaterally. *Sharp v. Sharp*, 65 Okl. 76, 166 P. 175 (1916). Extrinsic fraud may be shown to vitiate a judgment in a collateral proceeding regardless of what jurisdiction the rendering court had. *Cochran v. Barkus*, 112 Okl. 180, 240 P. 321 (1925). The conclusiveness of a judgment extends only to the question directly in issue, and not to any incidental or collateral matter, though it may have arisen and been passed on. *Spencer v. Woods*, 208 Okl. 204, 254 P.2d 974 (1953).

Significant also, so far as we have found, is the fact that most of the Oklahoma cases on the subject deal with factual situations wherein the parties attempting the collateral attack turn out to be par-

---

**3.** Notwithstanding the parties "complete and irreconcilable incompatibility," Verna says she and Robert entered into a common-law marriage between August 7 and the day he died.

**4.** *Laws v. Fisher*, Okl., 513 P.2d 876 (1973).

ties to the proceedings under attack or people in privity with them.[5]

■ Other refinements of the collateral attack doctrine have been judicially molded to satisfy the court's sense of justice. One relevant here is found in the leading case of Old Colony Trust Co. v. Porter, 324 Mass. 581, 88 N.E.2d 135, 12 A.L.R.2d 706 (1949). There testatrix, Virginia, died two days after "marrying" one Charles Porter who earlier had obtained a decree of divorce from Gertrude Porter. Under Massachusetts law marriage operates to revoke a prior will of a party to the marriage, and as a consequence if Virginia's marriage to Porter was valid then she died intestate. To avoid this the trustee and other beneficiaries (including her minor children) named in Virginia's earlier will filed two petitions. The first one was filed in Porter's divorce action asking that the decree of divorce granted him be vacated on the ground it was void because the Porters misrepresented their residence in order to induce the Massachusetts court to take jurisdiction of the marital res. The second petition was filed in the probate court for probate of Virginia's will alleging it was not revoked by the Porter marriage in that it was void because of Porter's incapacity by reason of not having been validly divorced from Gertrude. The court held (1) that the beneficiaries could not directly attack the validity of the Porter divorce decree, but (2) the beneficiaries could collaterally attack it by offering the will for probate and moving to strike testatrix's alleged spouse (Porter) from the case on the ground he had no interest in the estate and no standing as a will contestant because of his incapacity to marry Virginia in that his earlier divorce decree was obtained by falsely representing a jurisdictional fact of residence and therefore void. The decision embraced what was characterized as a "general and established rule of law" that a stranger (one not a party to the assailed proceeding) whose rights and interests have been adversely affected collaterally by a judgment which for any reason is void shall not be estopped from asserting such affected rights and protecting such interests in some other proceeding even though the validity of the earlier judgment is incidentally drawn in question. This sound view we adopt as consistent with the general collateral attack law promulgated by the supreme court of this state.

The same result was reached in In Re Waters' Estate, 100 Utah 246, 113 P.2d 1038 (1941). One Charles Waters died intestate in August 1939 while living with Silvia as husband and wife. After Silvia was appointed administratrix Charles' former wife Lena found out about the proceedings, filed a petition to remove Silvia as administratrix and for her own appointment to the post alleging that she married Charles in 1935 and that a "purported decree of divorce" granted by a Utah court in 1938 was "wholly void" because (1) at the time he filed the action Charles had not resided in Utah for the required year; (2) no summons was ever issued; (3) the publication affidavit Charles filed was insufficient; (4) that such insufficiency was intentional and designed to deceive the court; (5) Lena had no knowledge of the proceedings while they were going on but Silvia did. The court held a demurrer to Lena's petition should not have been sustained by the trial court even though she was collaterally attacking the Utah decree by facts dehors the judgment roll, saying: "We are not, however, disposed to hold that in such a proceeding as this petitioner should be trammelled by the rules relative to collateral attacks on a judgment. That a suit in equity to set aside a decree on the ground of want of jurisdiction in the court rendering it or on the ground of fraud is a direct attack thereon is settled doctrine in this state. Where the death of a party,

---

5. The lawyers representing three of the decedent's blood relatives (opponents of appellants) in the trial court withdrew their clients from the motion to dismiss appellants' petitions after a similar analysis of the law convinced them appellants had a right to be heard.

whose alleged fraud upon the court cheated his adversary of his day in court, precludes the latter from maintaining a suit to set aside the decree, the same latitude should be allowed as in such suit, to establish, in a proceeding in his estate, a right purportedly cut off by the allegedly void decree. The aggrieved party should be permitted to show to the court the facts relative to such lack of jurisdiction or of fraud as would be permitted in any direct attack on the judgment. The death of the other party should not, because it precludes an attack on the total judgment, likewise hamper the wronged party in the introduction of evidence relative to his status and the rights flowing therefrom, in cases where had such death not intervened such evidence could be availed of to secure such rights."

Here the facts are even more unique if not bizarre. Exactly how both Barbara and Patty hope to succeed in their quest for the single slot of widowhood is not clear. But what is clear is the fact that under the peculiar circumstances of this case we can conceive of no legal, equitable, or logical reason why each of them should not have an opportunity to prove she was a legal wife rather than a concubine. Neither appellant, really, is trying to vacate the Verna divorce decree. Accepting the allegations of Barbara and Patty as true for the purpose of testing the merits of appellee's demurrers, it must follow that each was deceitfully imposed upon by decedent at the commencement of their cohabitation with him. It cannot be sound law to compound his fraud by denying his victims an opportunity to expose the wrong in pursuit of an equitable protection of their legal rights. Certainly if one of the appellants eventually is judicially determined to be the lawful nuptial partner of Robert from January 13, 1972, to the date of his death,

then an incidental side effect will be that the trial court in granting Verna a divorce was without a jurisdictional res or subject matter.

Moreover, to hold neither Barbara nor Patty can assert her claim under the facts of this case is to allow invocation of the collateral attack rule to effect an affront to equity and a defeat for justice by binding Barbara and Patty to a divorce judgment of which they presumably had no notice and in which they took no part whatever. Nearly a century ago the United States Supreme Court, in *Hale v. Finch,* 104 U.S. 261, 26 L.Ed. 732 (1881), recognized that one not a party to an action nor notified of its pendency is not bound by such judgment. And here in Oklahoma the supreme court, in *Buck v. Simpson,* 65 Okl. 265, 166 P. 146 (1917), yielded to that reasoning in concluding that no one is bound by a judgment who was not a party to the underlying litigation or in privity with such a party.[6]

■ We therefore hold the two women appealing here, being strangers to the 1973 divorce proceeding, should be permitted to prove whether either had a legal common-law marriage with Robert from January 1972 to October 18, 1973, and if so to enforce what rights they possess as a result —rights which will have vested prior to the Verna romantic interlude and certainly prior to this probate proceeding. Since Barbara and Patty have a right to have their allegations heard, even though they incidentally tend to collaterally impeach the Verna divorce decree, the order appealed from is reversed and the cause remanded for further proceedings.

NEPTUNE, P. J., and BACON, J., concur.

---

6. Appellees cite several cases they call "similar" to the case at bar to support their theory that the petitions of Barbara and Patty amount to an impermissible collateral attack on the 1973 divorce decree. Yet all of the following cases are distinguishable in that the person collaterally attacking the judgment is either (1) a party or a privy to the judgment or (2) a stranger without a vested interest accruing prior to the assailed judgment. See *May v. Casker,* 188 Okl. 448, 110 P.2d 287 (1940) ; *Case's Will v. Case,* 246 Miss. 750, 150 So.2d 148 (1963) ; *Anderson v. Anderson,* 52 Wash.2d 757, 328 P.2d 858 (1958) ; *Travis v. Estate of Travis,* 79 Wyo. 329, 334 P.2d 508 (1949).